IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES DURST, | ) | Case No. 1:18-cv-1063 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Charles Durst, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Because substantial evidence supported the ALJ's decision and because Durst has failed to identify any error of law in the ALJ's evaluation of his claim, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.      Procedural History

Charles Durst protectively applied for DIB on August 3, 2015. (Tr. 160).  He alleged a disability onset date of June 1, 2008.  (Tr. 160[1]).  His application was denied initially on September 21, 2015 (Tr. 109) and on reconsideration on November 12, 2015.  (Tr. 117).  Durst requested a hearing, and Administrative Law Judge ("ALJ") Amy Budney heard the case on March 23, 2017.  (Tr. 35-59).  On July 31, 2017, the ALJ issued a decision finding that Durst

---

[1] ECF Doc. 11, Page ID# 3179.  All references to the transcript of administrative proceedings will be denoted "Tr." and refer to ECF Doc. 11.

was not disabled.  (Tr. 16-27).  On March 10, 2018, the Appeals Council denied Durst's request for further review, rendering the ALJ's conclusion the final decision of the Commissioner.  (Tr. 1-4).  On May 8, 2018, Durst filed this action to challenge the Commissioner's denial of his claim.  ECF Doc. 1.

### III.    Evidence

#### A.    Relevant Medical Evidence

Charles Durst was born on December 24, 1961 and was 46 years old on the alleged onset date.  (Tr. 160).  He worked for twenty-five years as an insulation installer.  In 2005, he was injured at work resulting in disc herniations at the L2-3 and L4-5 levels with lumbar stenosis at the L2-3, L3-4 and L4-5 levels.  (Tr. 1207-1208).  After a prolonged period of treatment, he returned to work in a light duty capacity.  On April 26, 2008, he fell off a ladder and suffered another work injury.  (Tr. 971).  An MRI of his lumbar spine showed a generalized annular disc bulge at L3-4; a small central disc herniation at L4-5; and a generalized disc protrusion at L5-S1.  (Tr. 855-857).  Durst was diagnosed with lumbar spinal stenosis, lumbar disc displacement and desiccation, lumbosacral neuritis, and brachial neuritis.  (Tr. 2228).

In June 2008, Durst reported to his treating physician, Rose Greenwald, M.D., that his left foot was numb, and he had pain going down his right leg.  (Tr. 2224).  Dr. Greenwald noted that Durst had no sensation to pin prick; his deep tendon reflex was absent in his left ankle; and he had a positive straight leg raise on the right with knee extension.  (Tr. 2224).  On July 7, 2008, Durst reported symptoms of depression to pain management specialist, Pasha Saeed, M.D.  (Tr. 1766).  She prescribed medication and ordered epidural steroid injections.  (Tr. 295, 1285, 1766).  On July 17, 2008, Durst complained of continued lower back pain with left leg pain and numbness and right foot weakness with extended walking.  Physical examination showed

positive straight leg raise test on the right, numbness to fine touch over the left thigh, and decreased right heel walking. (Tr. 2221). In August 2008, Durst complained of stiffness in his back with any standing greater than 30 minutes. (Tr. 2215).

On September 9, 2008, Durst followed up with Dr. Saeed after receiving a series of steroid injections. He continued to complain of residual low back pain, numbness in his left thigh, and decreased sensation in his right lower extremity. However, he reported improvement from the injections and that he was able to function better. Dr. Saaed increased Trazodone and prescribed Lidoderm patches. (Tr. 1281).

Durst followed-up with Dr. Saaed on October 9, 2008. He reported continued pain going down his right leg, numbness over his left thigh and increased pain with prolonged standing and walking. (Tr. 1165). On exam, Durst had decreased lumber range of motion, positive findings on the long sitting test on his right lower extremity, decreased strength in his right lower extremity and decreased ambulation even on level surfaces. (Tr. 1165-1166). At a follow-up visit with Dr. Greenwald in October 2008, Durst reported continuing numbness in his left anterior thigh and pain radiating down his right leg. On examination, Dr. Greenwald noted wide based gait, decreased sensation over his thighs and positive straight leg raise on the right. She prescribed Neurontin for nerve pain and Ultram for pain. (Tr. 2213). Durst received additional injections in November. (Tr. 294).

Durst began treating at Behavioral Health Center in December 2008 for depression and anxiety. (Tr. 233-235). Dr. Byung Minn-Jin observed that Durst had good eye contact, intelligence and motivation. He assigned a Global Assessment of Functioning ("GAF") score of 60. (Tr. 234). Durst's chief complaint was that he was irritable, frequently angry and had verbally explosive episodes. (Tr. 236). He was diagnosed with generalized anxiety disorder and

major depression, single episode, mild.  (Tr. 234, 240).  Social worker, Kathleen Balcerzak, assigned a GAF score of 50.  (Tr. 240).

Durst returned to see Dr. Greenwald on December 16, 2008, reporting that the injections were ineffective, and Ultram was not helping either.  He continued to have low back pain with pain and numbness radiating down his right leg.  He was walking with a limp and had positive straight leg raises on the right and decreased sensation and strength in his right leg and foot.  Dr. Greenwald prescribed Tylenol #3 for pain.  (Tr. 1237-1238).

At a follow-up visit on January 13, 2009, Durst reported only modest improvement of pain with Tylenol #3.  He reported worsening low back pain with radiation down his right leg, constant numbness in his right big toe and weakness in his right leg.  (Tr. 1179-1180).

Durst saw Gordon Bell, M.D., on January 21, 2009.  (Tr. 288-289).  Dr. Bell observed that Durst's spinal condition at the L4-5 level was "not particularly bad" and would not be relieved by spinal decompression surgery.  Dr. Bell also stated that "the most prominent feature [of examination was] the marked exaggeration of pain and overreaction that he seems to have." Dr. Bell indicated Durst's symptoms that were "distinctly uncommon with any kind of radiculopathy."  After reviewing MRI scans, Dr. Bell told Durst that he did not recommend surgery as he thought it would have little, if any, effect on his overall quality of life.  (*Id.*).

Treatment notes from February 2009 state that Durst could only ambulate for 30 minutes without his right leg buckling and that ambulation increased his low back pain and right leg numbness.  (Tr. 1173).

In March 2009, Ms. Balcerzak noted that Durst was struggling; he was very angry about his physical injuries.  (Tr. 256).  Durst met with spine surgeon, Teresa Ruch, M.D., on March 23, 2009.  On exam, Dr. Ruch noted decreased sensation on Durst's buttocks all the way down the

back of his leg to the tip of his foot in the L5-S1 distribution on the right and decreased deep tendon reflexes.  (Tr. 287).

In April 2009, Durst reported continued low back pain, greater on the right than the left, with continued numbness down his right leg.  Examination showed decreased sensation over the right thigh and back as well as muscle spasms.  (Tr. 2192-93).  In May 2009, Durst's social worker noted more anxiety.  He reported an increase in irritability.  (Tr. 254).

A lumbar spine MRI on May 11, 2009 showed stenosis at the L2-3, L3-4, L4-5 and L5-S1 levels, as well as spondylolisthesis at the L5-S1 level.  (Tr. 268, 271-272).  On May 29, 2009, Durst met with Dr. Greenwald.  He continued to have lower back pain and was also having some mid-thoracic discomfort and pain, which was a burning pain.  (Tr. 2185).  He had tenderness with palpation of the right paraspinous muscles.  Dr. Greenwald ordered a thoracic spine MRI. (Tr. 2185-2186).  The MRI revealed a right subarticular herniation at the T8-9 level.  (Tr. 285).

Durst saw Dr.  Greenwald on July 9, 2009.  He was continuing to have low back pain radiating to his left lower extremity as well as the right.  Examination showed positive straight leg raises on the left and a wide based gait.  (Tr. 264-265).

Durst saw Dr. Ruch again on July 31, 2009.  She explained to him again his surgical options, which included laminectomies, foraminotomies and fusion due to the severity of his condition.  (Tr. 174).  A lumbar CT scan taken on September 29, 2009 showed moderate to severe canal narrowing and moderate foraminal narrowing at L4-5; and moderate canal narrowing and moderate to severe foraminal narrowing at L5-S1.  (Tr. 741).

Durst saw Dr. Greenwald on January 14, 2010.  He was still considering surgery.  He continued to have low back pain with pain and numbness radiating down his legs, greater on the

right than the left.  (Tr. 721).  Examination showed positive straight leg raise and numbness over his right thigh and lower leg.  (Tr. 722).

On April 23, 2010, Durst saw Dr. Ruch, a surgeon, after the Bureau of Workers' Compensation had approved his spinal surgery.  (Tr. 731). In July 2010, Durst was still having pain and "significant neurological symptoms."  (Tr. 2148).

On October 6, 2010, Durst had another lumbar CT scan which showed moderate facet arthrosis and central canal stenosis at L2-3; diffuse disc bulging, moderate facet hypertrophy, moderate-to-severe canal narrowing and mild-to-moderate lateral recess stenosis and foraminal stenosis at L3-4; moderate facet arthrosis, moderate-to-severe canal narrowing and recess stenosis at L4-5; and severe disc space narrowing, vacuum phenomenon, canal narrowing and moderate-to-severe foraminal narrowing at L5-S1.  (Tr. 692).

On October 7, 2010, Durst underwent back surgery.  Specifically, Dr. Ruch performed laminectomies at the L2-3, L4 and L5 levels; bilateral foraminotomies; and a lateral fusion with pedicle screws, bone graft and BMP.  (Tr. 681-682).

After his back surgery, Durst continued to report right leg numbness and decreased sensation in his lower extremities.  (tr. 599, 603, 611, 696, 697, 1703).  He did physical and aqua therapy throughout 2011.  (Tr. 467, 470, 471, 474-475, 555, 568, 571, 574, 583-584).  In January 2011, Durst reported that he was able to do his own laundry and housework without too much difficulty.  (Tr. 697).  On May 11, 2011, Durst reported that his pain was worse with walking; some days it was "ok," then he woke up with a lot of pain.  (Tr. 580).

On June 1, 2011, Durst saw Dr. Greenwald.  He continued to complain of lower back stiffness and achiness, worse with bending over.  He also had a burning pain in his left buttock that moved into his lateral left leg as well as pain and numbness radiating down both his legs.

6

(Tr. 561).  Dr. Greenwald noted that he had decreased sensation to fine touch in his right leg and left calf.  He had positive straight leg raise test on the left.  He was still very limited in what he could do.  Dr. Greenwald noted that he was unable to lift more than twenty pounds and could not bend or carry objects.  They discussed that he should consider alternative careers.  (Tr. 562).

In September 2011, Durst began a work conditioning program offered by the Bureau of Workers' Compensation.  Durst reported that he was having difficulty and was slower at most activities of daily living.  He could stand for 20 minutes and could walk no more than 30 minutes.  (Tr. 1029).  He had decreased strength in his lower extremities, decreased lumbar range of motion, positive straight leg raise on the right and positive Faber's sign bilaterally.  (Tr. 1030).  Durst's condition improved with therapy, but he continued to experience lower back pain, was taking a prolonged time to perform many activities of daily living.  He had the same physical findings in November 2011.  (Tr. 467-468).  He was discharged from the work conditioning program in December 2011.  He continued to have the same exam findings as when he started in September 2011.  His therapist opined that his prognosis was good, and he had met 50% of his goals.  (Tr. 1087-88).

In October 2011, Durst saw Dr. Greenwald complaining of lower pack pain radiating down his right hip with numbness in his lower extremities.  On exam, Dr. Greenwald observed positive straight leg raise test and numbness in Durst's lower extremities.  (Tr. 1689-1690).  In December 2011, Dr. Greenwald noted that, despite attending the work conditioning program, Durst continued to complain of a burning sensation in his right lower back and buttocks.  However, he felt more flexible and less stiff.  He had a positive straight raise leg raise on the right.  (Tr. 460-461).

In 2012, Durst took accounting classes.  He continued to have back pain and numbness of the right leg.  (Tr. 420, 426, 434-435, 444-445).  In August, he told Dr. Greenwald that he had been riding bikes and had some mild stiffness in his joints after riding.  (Tr. 439).

Durst started treating with pain management physician, Ernad A. Mikhail, M.D., in September 2013.  (Tr. 316-320).  Durst reported that had aching and dull pain in his lumbar region.  The pain interfered with some daily activities and occasionally with his sleep.  (Tr. 316).  On examination, Durst had a mildly antalgic gait, diffuse tenderness, paraspinal muscle spasms, and decreased bilateral hip and lumbar range of motion.  (Tr. 319).

In October 2013, Durst continued to have a mildly antalgic gait, decreased lumbar range of motion, right lower extremity radicular pain and dysesthesia in the L4 distribution, decreased right lower extremity strength, decreased deep tendon reflexes in the right lower extremity, positive straight leg raise test on the right and positive findings on the hyperextension test for pain.  (Tr. 1314-1315).  Dr. Mikhail wrote "handicap placard" in the comment sections of his treatment notes for October 2, 2014.  (Tr. 1316).  Dr. Mikhail noted that Durst was doing okay with his current management; that he should increase his activity and follow-up in two months.  (Tr. 1316).  In a letter dated October 21, 2013, Dr. Mikhail stated that Durst needed to wear a back brace.  (Tr. 1304-1306).

In November 2013, Dr. Mikhail noted positive straight leg raise test for both legs, muscle spasms, mild-to-moderate antalgic gait, decreased strength in his bilateral glutes and lower extremities, positive lumbar and hip pain provocation testing, and radicular pain and dysesthesia in his bilateral lower extremities in the L5 distribution.  (Tr. 1225-1226).

On December 17, 2013, Durst underwent a Functional Capacity Evaluation ("FCE"). (Tr. 1207-1222).  Durst was able to sit for 30 minutes or longer without interruption.  (Tr. 1218).  The

administering therapist opined that Durst could occasionally do medium work (lift up to 50 pounds) and frequently up to 25 pounds. His back pain increased with heavy weights but improved once the weight was taken away. (Tr. 1221). She opined that he could frequently stand and sit. He could occasionally reach above the shoulder. She opined that he could sit for up to 50 minutes at a time, would perform best by alternating sitting and standing, and would need to be able to move around occasionally. (Tr. 1221).

On January 8, 2014, Durst complained that his pain was interfering with his sleep more than previously and his mobility was worse. (Tr. 2667). Dr. Mikhail continued Durst's prescriptions for Norco, Neurontin and Trazodone. (Tr. 2670). He noted that the severity of Durst's pain was increasing and the back brace was providing 50% relief from the pain. (Tr. 2667).

In May 2014, Nancy Miller, an employment case manager, noted that Durst had been released to work 7 hours per day for 35 hours per week and could lift and carry up to 20 pounds. (Tr. 614). His primary barriers to employment in accounting and bookkeeping were "the gap since his last day worked, his lack of experience in the accounting field, and the local labor market." (Tr. 615).

### B. Opinion Evidence - State Agency Reviewing Physicians

On September 20, 2015, Esberdado Villanueva, M.D., reviewed Durst's records and opined that he was capable of performing light work with some postural and environmental limitations. (Tr. 88-90). On November 11, 2015, Stephen Sutherland, M.D., reviewed Durst's record and agreed with the opinions of Dr. Villanueva. (Tr. 99-101).

### C.      Relevant Testimonial Evidence

#### 1.      Durst's Testimony

Durst was fifty-five years old when the hearing took place on March 23, 2017.  (Tr. 35, 38).  He was six feet tall and weighed 165 pounds.  He had a driver's license and drove himself to the hearing.  He resided with his wife.  (Tr. 39).  He had recently completed an associate degree in business with most of his classes in accounting.  (Tr. 40).

Durst attempted to work in 2014, but his job lasted only four days due to pain.  (Tr. 40). Prior to that he installed insulation as a laborer from 1983 to 2008.  (Tr. 41).

Durst said he could not work because he had a hard time sitting or standing very long. (Tr. 41-42).  Prior to his back surgery, he was miserable.  He spend most of his time lying down. (Tr. 42).  He had surgery in 2010 but his back was never 100% better.  The most he was able to walk was 15 minutes at the grocery store.  (Tr. 43).  His pain level was similar and he still lounged for three to four hours a day.  (Tr. 44).  He found that pacing was the best method to ease his pain.  He paced for three to four hours a day.  (Tr. 49-50).  Durst also had anxiety during which he thought about his accidents and his back surgery.  (Tr. 50-52).

Durst was able to do dishes, but not all at one time.  He could also do a little laundry. (Tr. 45).  He was able to shower and dress himself, but putting socks and shoes on took a while. He was able to lift a gallon of milk.  (Tr. 46).  He had stairs in his house.  He would do down them sideways holding onto the rail.  (Tr. 47).  When he went to school for his accounting classes, he sat in the back of the room and stood up and moved around every 20 minutes.  (Tr. 48).  Durst slept a total of four to five hours at night and took a 90-minute nap every day.  (Tr. 52-53).

## 2.    Testimony of Mark Anderson, Vocational Expert

Vocational Expert ("VE") Mark Anderson also testified at the hearing.  (Tr. 55-58).

Durst's past work was as an insulation installer at the medium exertion level.  (Tr. 56).  The VE

was asked to consider an individual of Durst's age, education and work experience who was able

to perform light exertional work activities, except he could only occasionally climb ramps and

stairs; frequently stoop and crawl; never climb ladders, ropes and scaffolds; and could never be

exposed to unprotected heights.  (Tr. 56).   This individual could not perform Durst's past work.

(Tr. 56).  However, he would be able to perform the jobs of assembler of small products,

inspector and hand packager, and electronics worker.  (Tr. 56.)  There were a significant number

of these jobs in the national economy.  (Tr. 56).  And, he would be able to perform these jobs

even if he needed to change positions every 30 minutes for one to two minutes; could only

occasionally kneel, crouch, stoop and crawl; could occasionally reach overhead, and could

understand, remember and carry out simple, routine tasks.  (Tr. 57).  However, he would not be

able to perform these jobs if he needed to walk for five or ten minutes before returning to his

work.  (Tr. 58).

The VE testified that an individual could be off task up to 15% of the time.  More than

that would preclude work.  He testified that employers would tolerate up to two absences, tardies

or leaving early.  (Tr. 57).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3.  Through the date last insured, Durst had the following severe impairments:
    lumbar disc displacement; cervical and lumbar spondylosis; degenerative disc
    disease of the lumbar spine; degenerative scoliosis; right thoracic disc
    herniation at T8-9; stenosis of the lumbar spine; lumbar spondylolisthesis at
    L5-S1; lumbar radiculopathy; L5-S1 narrowing; status post lumbar fusion;

displacement of lumbar intervertebral disc without myelopathy; history of lumbosacral neuritis; and a history of brachial neuritis.  (Tr. 18).

5.  Durst had the residual functional capacity to perform light work, except he could occasionally climb ramps and stairs.  He could occasionally kneel, crouch, stoop and crawl.  He could never climb ladders, ropes or scaffolds.  He could never be exposed to unprotected heights.  He could change positions every 30 minutes for 1-2 minutes within the immediate vicinity of the workstation.  He could occasionally reach overhead bilaterally.  (Tr. 20-21).

10.  Through the date last insured, there were jobs existing in significant numbers in the national economy that Durst could perform.

Based on all her findings, the ALJ determined that Durst was not under a disability from June 1, 2008, the alleged onset date, through December 31, 2013, the date last insured.  (Tr. 26).

## V.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).  The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); see also *Her v.*

*Comm'r of Soc. Sec.*, 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  See *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v. Comm'r of Soc. Sec*. 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering a Social Security benefits application, the Social Security Administration must follow a five step sequential analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether the claimant can still perform his past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.  A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. §404.1512(a).

### B.    Residual Functional Capacity

The determination of a claimant's residual functional capacity ("RFC") is an administrative finding reserved to the Commissioner based on an evaluation of the totality of the record evidence.  *See Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017), citing *Rudd v. Comm'r of Soc. Sec*., 531 F. App'x 719, 728 (6th Cir. 2013).  Durst argues that the ALJ's RFC finding was not supported by substantial evidence in this case.

First, Durst contends that the ALJ's RFC finding lacks substantial support because she did not recognize his mental impairments as severe.  ECF Doc. 12 at Page ID# 5988-5989.  The regulations provide that findings of no limitations or only mild limitations generally result in non-severe findings.  20 C.F.R. § 404.1520a(d)(1).  ("If we rate the degrees of your limitation as "none" or "mild," we will generally conclude that your impairment(s) is not severe, unless the

14

evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.")

The Sixth Circuit has construed the Step Two severity regulation as a "*de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p, 1996 SSR LEXIS 10 (July 2, 1996). However, once an ALJ determines that one or more of the claimant's impairments are severe, she must consider all the claimant's severe and non-severe impairments in the remaining steps of the sequential analysis. *See Anthony v. Astrue,* 266 F. App'x 451, 457 (6th Cir. Ohio 2008), citing *Mariarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987) (holding that the failure to find that an impairment was severe was harmless error when other impairments were deemed severe). In cases such as this, courts look to see whether the ALJ actually considered the impairments deemed non-severe at later steps in the sequential analysis. *See Simpson v. Comm'r of Soc. Sec.,* 344 Fed. App'x 181, 191, 2009 U.S. App. LEXIS 19206 (6th Cir. 2009); *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009).

Here, the ALJ determined that Durst had severe impairments related to his back condition. (Tr. 18). She explained why she found that his mental impairments were not severe. (Tr. 19-20). Then, she considered Durst's mental impairments at later steps in the sequential analysis. For example, in explaining her RFC finding, the ALJ considered notes from Durst's therapist and assigned partial weight to them, stating:

> The undersigned gives partial weight to the opinion evidence of Ms. Balcerzak. The undersigned finds that the claimant has no more than mild mental functioning limitations. Even the claimant's therapy notes state that the claimant maintains his activities of daily living despite depressive symptoms. (Ex. 1F/6). He also

15

> had good eye contact and was described as motivated (*id.*).  The treatment notes
> state that the claimant's GAF score was around 60 (*id.*).  Therefore, the
> undersigned gives the opinion evidence of Ms. Balcerzak only partial weight.

(Tr. 23).  Thus, even if the ALJ should have found that Durst's mental impairments were severe,

her failure to do so was harmless error because she considered them in later steps of the

sequential analysis.

Moreover, Durst has not argued that the ALJ should have incorporated more restrictions

into his RFC based on his mental limitations.  Durst criticizes the ALJ for repeatedly stating that

he completed college courses during the period of disability and was able to perform household

chores.  ECF Doc. 12 at Page ID# 5989.  But these facts were relevant to the ALJ's

determination that Durst's mental impairments did not limit his ability to function.  He was

functioning at a relatively high mental level by completing college classes.  It was not error for

the ALJ to consider this fact in determining his RFC.

Durst also complains that the ALJ did not provide greater evaluation of the assigned GAF

scores and their significance in indicating serious and moderate limitations.  ECF Doc. 12 at

Page ID# 5989.  The Sixth Circuit takes a case-by case approach to the value of GAF scores.

*Miller v. Comm'r of Soc. Sec.,* 811 F.3d 825, 836 (6th Cir. 2016).  Depending on the record and

the facts of each case, the GAF scores may be significant or of little evidentiary value.  *See*

*Kornecky v. Comm'r of Soc. Sec.,* 167 F. Appx 496, 511 (6th Cir. 2006); *Keeton v. Comm'r of*

*Soc. Sec.,* 583 F. App'x 515, 529-530 (6th Cir. 2014); *Gribbins v. Comm'r of Soc. Sec. Admin*.,

37 F. App'x 777, 779 (6th Cir. 2002).  GAF scores between 41 and 50 represent serious

symptoms, while those between 51 and 60 represent moderate symptoms.  *Kornecky,* 167 F.

App'x at 502 n. 4, 503.  A single GAF score can be an unreliable and subjective indicator of

long-term functioning.  *See Deboard v. Comm'r of Soc. Sec.,* 211 F. App'x 411, 415.  Here, the

ALJ noted Durst's GAF scores in her decision and considered his mental impairments in the later steps of her sequential analysis.  Durst's GAF scores were assigned in 2008, before he underwent back surgery, received various therapies, including occupational therapy, and attended college classes.  The ALJ was not required to further evaluate the 2008 GAF scores and it was not error for her to fail to do so in this case.

Durst also contends that the ALJ provided very little analysis of the medical evidence related to his physical impairments.  ECF Doc. 12 at Page ID# 5989-5990.  Durst complains that the ALJ only cited 11 office visits from his extensive six years of treatment for his back impairments.  But, the ALJ was not required to discuss every piece of evidence in the written decision.  *Kornecky v. Comm'r of Soc. Sec.* 167 F. App'x 496, 508 (6th Cir. 2006).

In addition to the treatment notes discussed in the ALJ's decision, she also considered several medical opinions, none of which supported a more restrictive RFC.  She considered an opinion from Dr. Mikhail that Durst should wear a back brace.  She limited Durst to light work, in part because of this opinion, but she also noted that Dr. Mikhail's opinion was based on a dissimilar workers' compensation standard of review.  (Tr. 23).  She assigned great weight to the opinion of Durst's occupational therapist from December 2013.  Pursuant to this opinion, the ALJ limited Durst to light work and included a requirement that Durst be permitted to stand and move around every hour for a minute or two.  (Tr. 23).  The occupational therapist opined that Durst could occasionally perform medium work, so the ALJ's RFC was more restrictive than the occupational therapist's opinion.  The ALJ considered an opinion from treating physician, Dr. Beers, even though she did not start treating Durst until a year after the date last insured.  (Tr. 23-24, 2738-2740).  Dr. Beers opined that claimant would need a sit/stand option every 30 minutes, and the ALJ gave this opinion partial weight.  (Tr. 24).  The ALJ considered the opinions from

the state agency reviewing physicians who reviewed Durst's records in 2015.  She gave their opinions only partial weight because they were not able to examine Durst.  (Tr. 24).  The ALJ's RFC determination is more restrictive than the opinions from the state agency reviewing physicians and it was based on substantial evidence in the record.

Basically, Durst complains that the ALJ did not focus on evidence in the record that would have supported a disability finding.  However, even if evidence existed in the record to support a different outcome, the ALJ's decision would not be invalidated.  *Buxton v. Halter,* 246 F.3d 762, 772-773 (6th Cir. 2001); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 289-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.");  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).  Here, the ALJ discussed portions of Durst's medical records and medical opinions in the record supporting her RFC determination.  Her decision was supported by substantial evidence.

Durst also complains that the ALJ's determination – that he could walk and/or stand for six out of eight working hours – was not supported by substantial evidence.  ECF Doc. 12 at Page ID# 5990.  Durst does not cite any medical opinion or treatment note specifically limiting him to less than six hours of walking and/or standing.  Rather, he cites portions of the records which *he argues* support a more restrictive walking and/or standing limitation.  Once again, Durst fails to identify an error.  Even if the ALJ did not cite the same evidence as Durst, she cited evidence supporting her decision.  She considered the medical opinions in the record and the

18

RFC determination was reserved to her.  *See Shepard,* 705 F. App'x at 442; *Rudd,* 531 F. App'x at 728.  The fact that other evidence existed that would have supported a different outcome does not invalidate the ALJ's determination.  *Her,* 203 F.3d at 289-90.

Durst argues that the ALJ erred by failing to discuss medical records from after his back surgery.  He cites records purportedly showing objective findings regarding ongoing back problems after surgery and contends that the ALJ should have discussed this evidence.  ECF Doc.12 at Page ID# 5992.   Again, the ALJ was not required to discuss every piece of evidence in the record, particularly in a case like this one in which the record is nearly 3,000 pages.  *See Kornecky,* 167 F. App'x at 508.  And, the ALJ did discuss some records from after the surgery such as:

> As of December 18, 2012, the claimant was taking 4 college classes and was reportedly doing well despite chronic back pain (Ex.2F/161).  The claimant also received treatment with a pain management clinic for back pain.  On September 18, 2013, the claimant saw Emad Mikhail, M.D.  The doctor stated that the claimant had a moderate level of pain or about a 5 of 10 out of severity (Ex.2F/75).  Finally the claimant had a functional capacity evaluation on December 17, 2013 (Ex.2F/399).  The physical therapist noted that the claimant was performing at the medium physical demand level.  (*Id.*)

(Tr. 22).  Durst does not argue that the ALJ's summary of these records was inaccurate or that they did not exist.  Nor does Durst argue that the records he cites would have necessarily made a difference in the ALJ's RFC determination.  He simply argues that the ALJ should have discussed more post-surgery records and reached a different conclusion.  He does not cite any authority supporting this argument, and he does not explain how this would have made a difference.  For these reasons, Durst's argument that the ALJ should have discussed more post-surgery treatment records is not well taken.

Durst contends that the ALJ should have discussed Dr. Greenwald's office notes from June 1, 2011 stating that Durst was still "very limited in what he is able to do.  Cannot lift > 20#,

unable to bend or carry objects.  Did discuss with [patient] looking into alternative careers (more office/desk work) due to his cont'd objective [symptoms] from his lumbar strain."  (Tr. 562).  But the ALJ's RFC determination was not necessarily contrary to this treatment note.  The ALJ found that Durst was able to perform work at the light exertional level and that he was unable to perform his previous work as an insulation installer.  (Tr. 20, 25).  The ALJ did not err in failing to discuss this specific treatment note.

Durst also criticizes the ALJ's assessment of Dr. Mikhail's records.  ECF Doc. 12 at Page ID# 5995.  Durst argues that the ALJ should have considered the handicap placard authorized by Dr. Mikhail.  But Dr. Mikhail did not provide an opinion regarding Durst's ability to function in the workplace; one of his treatment notes simply stated: "handicap placard."  (Tr. 1316).  There was no explanation in this treatment note as to why Durst required the placard or how long he would need to use it.  And, this same treatment note stated that Durst had been "counseled to increase activity."  Durst argues the significance of this treatment note, but it was not error for the ALJ to omit a discussion of this specific treatment note.  She reviewed the medical evidence as a whole and her RFC determination was supported by substantial evidence.

Finally, Durst complains that the ALJ assigned great weight to the functional capacity examination but failed to properly incorporate its findings into the RFC.  ECF Doc. 12 at Page ID# 5996-5997.  Specifically, Durst argues that the occupational therapist's note that he needed to "occasionally" move around meant that he needed more "move around" time than the 1-2 minutes incorporated into the ALJ's RFC determination.  Durst's reasoning is that "occasionally" was defined as 1-33% of the time.  (Tr. 1221).  Thus, using the maximum amount of this range, Durst argues that he needed to move around 33% of the time (or 20 minutes) rather than the 1-2 minutes assessed by the ALJ.  He argues that this is consistent with his own

testimony that he needed to move around and pace for 15 minutes before returning to a stationary position. (Tr. 53).

Contrary to Durst's argument, the occupational therapist did not opine that he required the ability to move around for 20 minutes per hour. In fact, she opined that his abilities were within the range of demands of an accounting clerk position "as long as he was able to move around occasionally." (Tr. 1221). Because the definition of "occasionally" was anywhere from 1-33%, the amount of time that Durst needed to move around could be anything from less than one minute to 20 minutes. The ALJ's RFC determination was not contrary to this opinion.

Regarding Durst's own testimony that he needed to move around for 15 minutes before returning to a stationary position, the ALJ considered this testimony. (Tr. 21). However, she found it to be somewhat inconsistent with some of the medical records. For example, she noted mild objective findings in the record and a note from Dr. Bell indicating that Durst's leg symptoms were "not particularly bad to begin with." (Tr. 22). In assessing Durst's credibility, the ALJ noted that his allegations were not consistent with the record as a whole. She noted that he said he was unable to play with his grandchildren, but treatment notes stated that he was playing with his grandchildren on the floor the day before. She also cited a treatment note in which he rated the severity of his pain as 3/10. (Tr. 24). It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981). The ALJ was not required to incorporate a 15 minute "moving around" limitation into the RFC determination based on Durst's testimony, which she found was not entirely credible.

21

Moreover, the ALJ was not required to assign controlling weight to the opinion of the occupational therapist, who was not a physician and only examined Durst one time.  Under the regulations, she was considered an "other source."  SSR No. 06-03p, 2006 SSR LEXIS 5.  "[A]n ALJ has discretion to determine the proper weight to accord opinions from 'other sources.'" *Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 541 (6th Cir. 2007).  While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources,' the ALJ must nevertheless "consider" those opinions."  *Hatley v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 99471, 2014 WL 3670078 (N.D. Ohio 2014); *see also Brewer v. Astrue*, 2012 U.S. Dist. LEXIS 10643, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-03p, 2006 SSR LEXIS 5 does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").  Here, the ALJ considered the occupational therapist's functional capacity evaluation and assigned great weight to it.  The ALJ was not required to articulate a detailed analysis of her consideration of this evaluation.  Nor was she required to evaluate it for controlling weight or express good reason for not assigning more weight to it.  Thus, Durst fails to show any error in the ALJ's treatment of the occupational therapist's report.

The ALJ's RFC determination was based on substantial evidence in the record, which she explained in her decision.  Durst's argument that she should have discussed more evidence from the record is not well taken.  Because the ALJ's decision was supported by substantial evidence, it must stand even if there was evidence in the record supporting another conclusion.  *See Buxton,* 246 F.3d at 772-773; *Mullen,* 800 F.2d at 545; *Her,* 203 F.3d at 289-90.

## VI.    Recommendation

Because substantial evidence supported the ALJ's decision and because Durst has not identified any incorrect application of legal standards, I recommend that the ALJ's decision be AFFIRMED.

Dated: March 15, 2019

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).